**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 5247** |
| **v.** | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Patricia D.[3] was born on December 31, 1971. She alleges that she has been

disabled since her alleged onset date ("AOD") of January 16, 2016, because of weakness in her

left arm and hand, tingling in her feet, numbness in her legs, brain fog, autoimmune disease of

unknown type, severe fatigue, forgetfulness, and depression. (R. 184, 205.)  She applied for

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 16, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 8.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

Disability Insurance Benefits ("DIB") in June 2016 and her date last insured ("DLI") was December 31, 2020. (R. 204.) On September 27, 2018, an Administrative Law Judge ("ALJ") issued an opinion finding Plaintiff not disabled. (R. 17-42.) The Appeals Council denied review (R. 1-7), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Before the Court are Plaintiff's motion seeking remand of that decision (D.E. 12) and the Commissioner's cross-motion to affirm. (D.E. 24.)

## I.   Administrative Record

### A.   Medical Evidence

In January 2015, Plaintiff visited Dr. Kathryn Kiehn, M.D., a rheumatologist, for medication management and because of complaints of tingling in her left hand and memory issues. (R. 381-82.) Dr. Kiehn noted that despite Plaintiff's positive ANA test,[4] her symptoms – tingling and numbness in her hands and feet causing difficulty holding items, fatigue and memory issues – were of an unknown cause and did not fit into typical signs of connective tissue disease, despite her high ANA. (*Id.*) On examination, Plaintiff had full range of motion ("ROM") in her extremities, normal gait, and no tender points. (R. 383.) Dr. Kiehn prescribed amitriptyline, a medication generally used to treat nerve pain, and then increased the dose in March 2015 after Plaintiff reported less stiffness and fewer episodes of tingling and weakness in her hands. (R. 377.) Plaintiff continued taking amitriptyline after appointments in May and August 2015; in November 2015 she reported increased balance problems and underwent a brain MRI and bloodwork. (R.

---

[4] A positive ANA test means that antinuclear antibodies have been detected in a patient's blood, which suggests that "the immune system has launched a misdirected attack on [their] own tissue." Positive ANA could be indication of a connective tissue disease such as lupus or rheumatoid arthritis, although more testing would be needed to confirm the diagnosis. https://www.mayoclinic.org/tests-procedures/ana-test/about/pac-20385204. *Visited on* April 11, 2022.

366-67.) Her ROM continued to be normal at each appointment, and she had good muscle tone. (*Id.*)

The next treatment notes from Dr. Kiehn are dated January 22, 2016, just after Plaintiff's AOD. She complained of overall stiffness and worsening of the numbness in her hands, balance issues, and increased fatigue and memory issues. (R. 361.) Testing for suspected systemic lupus erythematosus ("SLE") was negative and her brain/neck MRI from November was unremarkable for neurological changes but showed mild-to-moderate multilevel degenerative changes in her cervical spine with stenosis but no cord compression. (R. 362, 464-65.) Plaintiff thereafter underwent cervical fusion disc surgery in February 2016. (R. 465, 750.) She visited Dr. Kiehn again in April 2016 complaining of continued body numbness and tingling, fatigue and inflammatory arthritis but noted that she was now able to hold a glass of water; the doctor again increased Plaintiff's dose of amitriptyline. (R. 358.) In May 2016, Plaintiff complained of joint pain "all over" and bilateral foot tingling and numbness and was still ANA positive. (R. 352.) Her dosage of amitriptyline was reduced so that she could begin a course of methotrexate, an immunosuppressant. (*Id.*) On examination, all of her extremity joints, her back, and her neck were normal and had full ROM with no swelling except for bilateral thickening in one ankle joint; she had multiple diffuse tender points. (R. 355.)

In July 2016, Dr. Kiehn identified numerous tender points although Plaintiff also had normal ROM and muscle tone; she reported improvement of her symptoms with the methotrexate. (R. 348-51.) Also in July, Plaintiff saw neurologist Ian Katznelson, M.D. as a follow up after her cervical spine surgery. (R. 647.) Dr. Katznelson noted that Plaintiff reported improved fine motor control in her left upper extremity and that she thought she might have become a bit more forgetful. (R. 647.) An MRI of her brain was unremarkable. (R. 670.) In September 2016, x-rays revealed

degenerative disc disease ("DDD") of the lumbar spine. (R. 571.) In October 2016, Plaintiff reported increased dizziness when climbing stairs and that she still had good and bad days;[5] Dr. Kiehn found multiple diffuse tender points. (R. 633-35.)

Plaintiff underwent a consultative physical examination in September 2016, at which Debbie Weiss, M.D., opined that Plaintiff's effort on testing was "fair-to-poor." (R. 567.) Dr. Weiss's overall clinical impression was that Plaintiff had multiple tender joints and trigger points from an unknown auto-immune disorder, decreased ROM in the cervical spine, lumbar spine, and shoulders, and impairment in the use of both hands. (R. 568.) During Plaintiff's mini-mental status examination she demonstrated some short-term memory issues; Dr. Weiss noted that Plaintiff seemed to be "down" but not overly depressed. (*Id.*) Plaintiff thereafter had a psychiatric consultative examination with Kenneth Heinrichs, Psy.D, in October 2016. (R. 640-43.) Dr. Heinrichs noted that Plaintiff had a depressed affect and demonstrated problems with short-term memory, auditory memory, attention, and concentration. (R. 642.) He opined that these problems would likely interfere with her ability to engage in some work-related activities without close supervision. (R. 643.) Her levels of understanding and persistence were normal, as was her social interaction, and her sustained concentration was limited. (*Id.*)

In January 2017, Dr. Kiehn discontinued Plaintiff's methotrexate in the face of elevated liver enzymes and prescribed azathioprine, an immunomodulator used to treat rheumatoid arthritis, instead. (R. 679.) That same month, Plaintiff saw Dr. Katznelson again "after rather prolonged absence" and reported that "everything is worse." (R. 751.) Dr. Katznelson noted that Plaintiff's many symptoms were of uncertain origin and was unable to determine what was wrong with her despite her continually positive ANA. (R. 752.) In May 2017, Plaintiff had an annual examination

---

[5] According to Plaintiff, "good days and bad days" referred to the severity of her symptoms of tingling, extremity numbness and fatigue she experienced on a particular day.

with internist Allison Holloway, M.D. (R. 807.) Plaintiff reported ringing in her ears, with her left ear worse than her right for one and one-half years and decreased hearing, but auditory testing with an ear, nose, and throat specialist was normal.[6] (*Id.,* 837-39.) Her motor skills and extremity strength were normal. (R. 809.)

In August 2017, Plaintiff had an initial appointment with rheumatologist Ximena Chavez, M.D. (R. 1117.) Dr. Chavez noted that Plaintiff had multiple tender points throughout her body but that she had intact muscle strength and no obvious swelling in her extremities, which she was able to move freely. (R. 1131.) Dr. Chavez diagnosed Plaintiff with a positive ANA and polyarthritis which suggested undifferentiated connective tissue disease, likely SLE, and also myalgias[7] secondary to her connective tissue disease. (*Id.*) Dr. Chavez continued Plaintiff on the medications azathioprine and amitriptyline and ordered x-rays of Plaintiff's hands, which showed mild swelling and mild degenerative changes in some of her joints. (*Id.,* 1128.) In September 2017, Dr. Katznelson ordered new thoracic and cervical MRIs because Plaintiff complained of worsening pain in her neck and back. (R. 855.) Dr. Katznelson again noted that Plaintiff's symptoms and test results did not suggest a single diagnosis and that her new rheumatologist was "basically treating her as a fibromyalgia case." (*Id.*, 1104.) He suggested that Plaintiff have an appointment with a psychiatrist. (*Id.*)

Also in September 2017, Plaintiff again saw Dr. Chavez, complaining of increased pain in her hips and back, and pain throughout her body as well as more fatigue and sporadic fevers. (R.

---

[6] Notes from the ear, nose and throat specialist, Leslie Block, M.D., state that Plaintiff's audio testing was "essentially normal tymps with fair reliability with the patient trying to over emphasize the [complaints of] her hearing loss but eventually good thresholds were obtained." (R. 840.)

[7] Myalgia describes muscle aches and pain, which can involve ligaments, tendons and fascia, the soft tissues that connect muscles, bones, and organs. https://www.hopkinsmedicine.org/health/conditions-and-diseases/myalgia. *Visited on* April 20, 2022.

1137.) Dr. Chavez again diagnosed inflammatory arthritis and noted that Plaintiff's most recent labs were ANA negative. (R. 1140.) She assessed Plaintiff as having proximal muscle strength in all four extremities and intact reflexes and added the steroid prednisone, noting that Plaintiff had improved on it in the past. (R. 1140.)

In October 2017, Plaintiff saw neurologist Michael Walsh, M.D., who reviewed her MRI from September, which revealed post-surgical changes and mild degenerative changes in Plaintiff's cervical spine and a normal lumbar spine. (R. 871, 887.) Dr. Walsh's advanced practice nurse noted that Plaintiff did not put full effort into her strength testing and thus it was difficult to determine if Plaintiff's diffuse weakness in her upper and lower extremities was related to her lack of effort or residual weakness combined with arthritis and fibromyalgia. (R. 891.) Plaintiff's coordination and fine motor skills were appropriate. (*Id.*) Dr. Walsh ultimately determined that further neurosurgical intervention was not needed. (R. 887.)

Plaintiff next saw Dr. Chavez in January 2018. She reported feeling better sometimes with an increased dose of azathioprine and the prednisone but complained of some pain in her midsection and when trying to catch her breath. (R. 1170.) She also reported that she had ringing in her ears "all the time." (*Id.*)

In March 2018, Dr. Katznelson documented weakness in Plaintiff's extremities after "poor effort as before." (R. 904.) He ordered new MRIs of her head, neck and back because of headaches and new complaints of back pain; the results of this MRI showed mild degenerative changes in Plaintiff's lumbar spine and otherwise stable findings and no intercranial abnormalities. (R. 913, 922.) In May 2018, Plaintiff saw neurosurgeon Robert Erickson, M.D., complaining of low back pain that radiated into her left foot and neck pain that caused tingling in her left hand. (R. 1083.) He reviewed the October 2017 and April 2018 MRI results and diagnosed Plaintiff with mild

6

stenosis and degenerative joint disease based on the 2018 MRI and suggested epidural injection treatments for the pain with the possibility of another cervical neck fusion in the future. (*Id.*) Plaintiff also saw Dr. Chavez who continued her on her amitriptyline and azathioprine and added gabapentin for muscle pain. (R. 1184.) On examination, Plaintiff had multiple tender points throughout her body but was able to move her extremities freely and had intact muscle strength. (R. 1185.)

On June 26, 2018, Dr. Katznelson completed a residual functional capacity ("RFC") form that opined Plaintiff would be likely to experience good days and bad days, and that it would be difficult for her to travel to work on bad days. (R. 1108.) He also wrote that Plaintiff would be able to work on "given days" but that she may not be able to complete a full week. (*Id.*) Dr. Katznelson did not fill out the part of the form asking for an assessment of Plaintiff's ability to sit, stand, walk, lift, carry, use fine motor skills or engage in other physical work activities over an eight-hour day. (R. 1109.) He checked the box for "yes" when asked if Plaintiff would have marked limitations in her ability to perform at a consistent pace and would be expected to experience significant deficiencies in concentration, persistence, and pace. (R. 1110.) He noted that it was unclear if Plaintiff's condition had improved with her cervical surgery and that her positive ANA was mostly treated by rheumatology. (R. 1107.) At the end of the document, Dr. Katznelson wrote that "the cause of [Plaintiff's] neurological symptoms have not been well differentiated despite some of her difficulties and conditions listed and would also look to other treating physicians for assistance." (R. 1111.)

Dr. Chavez completed an RFC opinion on June 24, 2018, describing Plaintiff's conditions as "inflammatory arthritis, history of ANA now negative, and fibromyalgia." Dr. Chavez was not entirely sure about how long each of Plaintiff's conditions had existed and when asked to provide

objective evidence of each condition, gave her answer as "per patient, she has described joint pain and/or swelling, pleuritic pain, myalgias." (R. 1112.) She noted that Plaintiff's joint pain had "improved some" and that she recently started a new medication for her myalgias; she was unable to give a prognosis for each condition, writing "this is ongoing – she has seen me four times." (*Id.*) Dr. Chavez checked the "yes" box that Plaintiff would reasonably be expected to have good days and bad days but did not complete the majority of the form, writing that it was difficult to determine the extent of Plaintiff's limitations and that she did not assess her ability to complete basic work activities over the course of a regular eight-hour workday.[8] (R. 1112-13.) She checked the "yes" boxes to agree that Plaintiff would have marked limitations in her ability to complete a normal workday and to perform at a consistent pace without needing unreasonable amounts of rest, but then wrote that she could not assess Plaintiff's ability to sustain concentration, persistence and pace. (R. 1115.) Dr. Chavez added a note at the end of the form that she was "not able to assess/answer all questions. Would benefit from functional assessment from PT." (R. 1116.)

The medical record also contains opinions from Agency doctors who assessed Plaintiff's physical and mental functioning at the initial and reconsideration levels. Dr. James Hinchen gave a physical RFC opinion on November 30, 2016, after reviewing Plaintiff's treatment records, including those from the consultative examination. (R. 81.) His RFC opined that Plaintiff was able to occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, and stand or sit for six hours out of an eight-hour workday. (*Id.*) She could occasionally climb stairs and ladders, balance, stoop, kneel and crouch. (R. 82.) With respect to manipulative limitations, Dr. Hinchen opined that Plaintiff was limited in her ability to reach with her right extremity and

---

[8] Dr. Chavez also checked the "yes" box in answer to the question whether Plaintiff would have significant problems sustaining any type of full-time work activity, but seemed to qualify that opinion by noting that Plaintiff "has stated she has not worked since she has been seeing me and even before that."

had unlimited gross manipulation and limited fine manipulation abilities. (*Id.*) In support of his RFC, Dr. Hinchen pointed to Plaintiff's improvements in her extremity weakness and tingling after her cervical fusion and several unremarkable brain and head MRIs. (*Id.*) In further discussion about the consultative examination, Dr. Hinchen also acknowledged Plaintiff's slow but otherwise normal gait and difficulties with getting on and off the exam table, tandem walking, and squatting. (*Id.*)

Gayle Williamson, Psy.D, provided a mental health opinion on November 28, 2016, after reviewing the medical record and acknowledging Plaintiff's deficits in short-term memory. (R. 78.) She assessed the Paragraph B factors and opined that Plaintiff had mild restrictions in her activities of daily living, moderate restrictions in her ability to maintain social functioning and concentration, persistence, and pace, and no repeated episodes of decompensation. (R. 80.) Dr. Williamson provided a mental RFC that opined Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or very short and simple instructions, but that she was moderately limited in her ability to remember and understand detailed instructions. (R. 84.) She also opined that Plaintiff had limitations in sustained concentration, persistence, and pace and was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, but that she was able to complete 1-2 step tasks. (*Id.*) Moreover, Plaintiff was not significantly limited in ability to perform within a schedule, maintain regular attendance, work in proximity to others without being distracted, make simple, work-related decisions, or complete a normal workday or work week without interruption from psychologically based symptoms. (R. 84-85.) On request for reconsideration by the Commission, Plaintiff alleged increased depression and burning in her hands. (R. 91.) After reviewing the medical evidence, including recent reports that her fine motor control was improved in July 2016

and a mostly normal rheumatology examination in January 2017, the initial RFC assessments and determination that Plaintiff was not disabled were affirmed by Russell Taylor, PhD on March 29, 2017 and Prasad Kareti, M.D. on April 4, 2017. (R. 98-101.)

Plaintiff's husband also provided an opinion in August 2016, stating that Plaintiff could no longer lift anything over five pounds easily, that she often got overheated just from walking relatively short distances, and that her feet got numb after standing for short periods of time. (R. 234.) He also explained that it took Plaintiff about 20 minutes to get up in the morning because of stiffness and that she groomed herself, did light housework, and took care of their school-aged children. (R. 235.) She was "okay" at following written and spoken instructions but sometimes missed steps (such as in a recipe) or needed repetition and review. (R. 240.)

## B. Hearing

At the hearing on June 29, 2018, the Plaintiff testified about her physical limitations including her cervical fusion surgery, more recent pain in her lower back, and fibromyalgia. (R. 54.) With respect to her mental health, she said she got depressed when she had "flares" of her fibromyalgia but had never had mental health treatment or taken medications for mental health. (*Id.*) She testified that she had a hard time sitting or standing for any length of time and trouble remembering things. (R. 52-53.) Since her cervical spine surgery, she regained the ability to hold a glass of water in her left hand without dropping it but could not hold anything heavier, she testified. (R. 53.) She has pain in the joints of both hands, in her lower spine, and with respect to her fibromyalgia, has pain "everywhere, in every joint." (*Id.*) She generally sleeps on the sofa because it takes too much effort for her to climb up and down the stairs. (R. 55.) Plaintiff also testified that she could do light housekeeping, is able to wash dishes on a good day, and helps her children with their homework. (R. 56.)

10

A vocational expert ("VE") testified in answer to the ALJ's hypothetical that an individual with Plaintiff's background who could work at the light exertional level except never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; frequently reach overhead and in all directions bilaterally and finger bilaterally; was able to understand, remember, and carry out simple, routine tasks; use judgment related to simple, work-related decisions and have occasional interactions with the public could not perform Plaintiff's past work as retail store manager. (R. 67-68.) However, there were a significant number of other jobs available to Plaintiff and if the hypothetical exertion level was reduced to sedentary there were a significant number of additional available jobs as well. (R. 68.)

**C.    ALJ Decision**

The ALJ undertook the five-step sequential evaluation process pursuant to 20 CFR 404.1520(a), finding that Plaintiff had the severe impairments of degenerative disk disease ("DDD") of the lumbar spine, DDD of the cervical spine, status post ("s/p") fusion at C4-C6, bilateral hand osteoarthritis ("OA"), obesity, fibromyalgia, major depressive disorder ("MDD") and neurocognitive disorder. (R. 22.) She also found that Plaintiff had the non-severe impairments of hypertension, renal artery stenosis, and bilateral tinnitus. (R. 23.) As relevant here, the ALJ determined that Plaintiff's tinnitus was non-severe because the record contained no audiogram testing Plaintiff's hearing and several examinations confirmed that Plaintiff did not experience hearing loss or speech difficulties because of her tinnitus. (*Id*.) Next, the ALJ determined that none of Plaintiff's impairments met a Listing, undertaking an analysis of the "Paragraph B" criteria with respect to Plaintiff's mental impairments. Ultimately, the ALJ determined that Plaintiff had the RFC to perform light work, with the limitations that she could not climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 26-27.) She could frequently reach overhead and in all directions, bilaterally and also

11

frequently finger bilaterally. (R. 27.)  With respect to non-exertional limitations, the ALJ found

that Plaintiff could understand, remember, and carry out simple routine tasks and that her use of

judgment was limited to that necessary for the performance of simple, work-related decisions. (*Id.*)

She could have only occasional interaction with the general public.  (*Id.*)

In support of the RFC, the ALJ stated that she evaluated the credibility of Plaintiff's

allegations against the entire record, including objective medical evidence in addition to the factors

identified in SSR 16-3p, concluding that "the full extent of claimant's allegations cannot be

reconciled with the evidence of record" and finding that while the record did support Plaintiff's

experience of significant work-related limitations, the limitations are "far less restrictive than

alleged." (R. 27-28.)[9]  Plaintiff disagrees, arguing that the ALJ (1) failed to account for Plaintiff's

non-severe impairments, particularly her tinnitus; (2) failed to accommodate all of Plaintiff's non-

exertional limitations; (3) did not have substantial evidence to support her discounting of Plaintiff's

statements regarding her symptoms; and (4) improperly rejected the opinions of Plaintiff's treating

neurologist and rheumatologist.  (Pl. Mem. in Sup. of Sum. J. at 5.)   We will address each issue

in turn.

## II.    ANALYSIS

### A.    Legal Standard

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which

means "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for

such evidentiary sufficiency is not high." *Id*.  In making this determination, "[w]e will not reweigh

---

[9] Those factors are (1) daily activities; (2) location, duration, frequency and intensity of pain; (3) factors
that aggravate the symptoms; (4) medications that alleviate symptoms; (5) treatment other than medication
that the individual has undergone to alleviate symptoms; (6) any other measures taken to relieve symptoms;
and (7) any other factors concerning functional limitations due to pain or other symptoms.

the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotations omitted).

### B. Plaintiff's Non-Severe Impairments

Plaintiff first argues that the ALJ erred by failing to factor limitations caused by Plaintiff's non-severe impairments into her RFC assessment. We disagree and find that substantial evidence supports the ALJ's treatment of Plaintiff's non-severe impairments as they impact the RFC. Specifically, while the record reflects a diagnosis of tinnitus, Plaintiff offers no evidence as to what limitations her tinnitus causes her. Instead, she describes and defines tinnitus in general terms and faults the ALJ for failing to consider how "documented symptoms" of tinnitus such as fatigue, stress, sleep problems and trouble concentrating impact the RFC. But the "documented symptoms" appear on a Mayo Clinic website describing possible effects from the condition to the general population; Plaintiff points to no evidence that tinnitus causes these symptoms in her in particular. An ALJ is not required to make an unsubstantiated leap from diagnosis to functional limitations; it is the burden on the Plaintiff to provide specific evidence about how an impairment affects her. *Megan G. v. Saul*, 19 C 5237, 2021 WL 2105038 at *9 (N.D. Ill., May 25, 2021), *citing Weaver v. Berryhill,* 746 F. App'x 574, 578-79 (7th Cir. 2018).

In addressing Plaintiff's non-severe impairments, particularly her tinnitus, the ALJ noted that Plaintiff's hearing was normal, that the medical record contains no audiogram detailing her hearing abilities, and that a neurological exam revealed no obvious cause of the ringing in Plaintiff's ears. (R. 23.) Other than the fact that Plaintiff was formally diagnosed with tinnitus in

May 2017, there are no additional mentions of it in the record at all, and thus we find that substantial evidence supports the ALJ's determination that it did not more than minimally limit the plaintiff's ability to work.

Plaintiff also takes issue with the ALJ's treatment of her auto-immune disease, which is not formally diagnosed but is suspected by several doctors to be SLE. (R. 1131, 1140, 1170.) While her argument is not entirely clear, Plaintiff appears to allege that the ALJ's failure to definitively accept an SLE diagnosis was reversible error because that meant she also disregarded how the symptoms of lupus would affect Plaintiff's ability to sustain full-time work.  Plaintiff's argument is misplaced, however, because regardless of the source or cause of her joint pain, weakness, fatigue, brain fog, and forgetfulness, the ALJ took Plaintiff's particular symptoms into account when crafting her RFC and substantial evidence supports her decision that Plaintiff could work despite these symptoms.

Notably, the ALJ did not reject any of Plaintiff's alleged symptoms or limitations on the ground that she had not been formally diagnosed with SLE and indeed, none of Plaintiff's own doctors conclusively determined that Plaintiff had SLE.[10]  In discussing all of Plaintiff's impairments and symptoms, the ALJ acknowledged both fibromyalgia and "autoimmune disorder" as well as Plaintiff's allegations of fatigue, brain fog, forgetfulness and upper extremity weakness, summarizing Plaintiff's function report and hearing testimony in detail. (R. 27.)  Like with her argument concerning her tinnitus, Plaintiff appears to contend that the ALJ erred by not accounting for symptoms or limitations that "could" be attributed to SLE, for example by describing how "most people" present with lupus and describing what "typical" findings look like in a lupus

---

[10] In fact, one of Plaintiff's rheumatologists treated Plaintiff as if she had fibromyalgia and not SLE; Plaintiff provides no evidence about how this diagnosis versus one of SLE changed her treatment, limitations, symptoms, or prognosis.

14

patient. (Pl. Mem. at 9). Again, generalizations about a disease are not evidence about how it affects a particular individual, and as we discuss below, the ALJ properly accounted for all of Plaintiff's symptoms and limitations caused by her autoimmune disorders in her RFC determination.

### C.      Non-Exertional Limitations

Plaintiff's argument with respect to the RFC's non-exertional limitations amounts to little more than a disagreement with the way the ALJ weighed the evidence. While her argument is somewhat difficult to understand, she appears to contend that the ALJ erred in her Paragraph B assessment of Plaintiff's mental impairments by determining that certain of Plaintiff's normal abilities "cancelled out" other impaired abilities. For example, with respect to the factor of understanding, remembering, or applying information, Plaintiff contends that the ALJ impermissibly measured Plaintiff's impaired memory issues against her intact ability to understand, which caused the ALJ to conclude wrongly that Plaintiff's overall functioning in that area was mild.[11] Similarly, Plaintiff contends that the ALJ erred by determining she had only moderate limitations in her ability to interact with others because she both acknowledged Plaintiff's difficulties relating with "others" and bosses and also noted that she had no trouble with the police, had never been fired for social reasons, spent time socializing, cared for her children, talked on the phone, and was able to shop in public. (Pl. Mem. at 10).[12] Plaintiff offers no legal support for her contention than an ALJ is not allowed to assess a claimant's various abilities and impairments when determining an RFC; indeed, weighing the various evidence is exactly what an ALJ *must* do. *See, Harold G. v. Kijakazi*, No. 19 C 2191, 2022 WL 1185577, at *6 (N.D. Ill. Apr.

---

[11] To that end, Plaintiff also contends that while her abilities to watch television and scrapbook might have added weight to the finding that she could understand, they were irrelevant to her ability to remember.

[12] Plaintiff makes similar arguments with respect to the ALJ's evaluation of the other Paragraph B criteria.

21, 2022) ("Ultimately, it is for the ALJ to weigh the evidence and to make judgments about which evidence is most persuasive.") (internal citations omitted).

### D. Credibility

Beyond the question of her non-exertional limitations, Plaintiff also contends the ALJ's credibility analysis was flawed. Specifically, Plaintiff argues that that the evidence as a whole could not possibly support a finding that she was able to work, implying that the ALJ was wrong to conclude that "the full extent of claimant's allegations cannot be reconciled with the evidence of record." (R. 28.) Plaintiff contends that the ALJ's credibility analysis was flawed because the ALJ drew "false equivalencies, suggest[ed] Plaintiff (and her physicians and her husband) were exaggerating, and emphasiz[ed] an absence of objective evidence that likely does not exist." (Pl. Mem. at 12).[13]

We must defer to the ALJ's credibility determination unless it is "so lacking in explanation or support that we find it "patently wrong." *Elder v. Astrue,* 529 F.3d 408, 413–14 (7th Cir. 2008) (*quotation omitted*). *See also See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). An ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir.2004) (quotation omitted); *see also* 20 C.F.R. § 404.1529(c)(2). But at the same time, if, after considering and weighing the evidence and the factors listed in SSR 16-3p, "[a]n ALJ may

---

[13] As one example, she contends that it was error for the ALJ to acknowledge that Plaintiff regained only "some" strength in her hand and had "some" decrease in pain following her spinal surgery and then conclude that her remaining symptoms were not disabling, seemingly implying that any failure to recover completely from an impairment must result in a finding of disability. This is a misstating of the purpose of determining a claimant's RFC, which is a listing of the most he or she can do despite the continued existence of limitations. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013).

disregard a claimant's assertions of pain if he validly finds her incredible." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (citation omitted).[14]

In this case, the ALJ's determination was not patently wrong. As she explains in her opinion, the ALJ "evaluated the claimant's allegations of work-related disfunction . . . by determining their consistency with the entirety of the record, including the objective medical evidence as well as the additional factors identified in SSR 16-3p:" (1) daily activities; (2) location, duration, frequency and intensity of pain; (3) factors that aggravate the symptoms; (4) medications that alleviate symptoms; (5) treatment other than medication that the individual has undergone to alleviate symptoms; (6) any other measures taken to relieve symptoms; and (7) any other factors concerning functional limitations due to pain or other symptoms. (R. 28.)

The ALJ explained in considerable detail the reasons she found Plaintiff's allegations about the severity of her symptoms not entirely credible. To start, she described Plaintiff's many daily activities (while acknowledging her testimony that some were more difficult or took her longer than they used to), not to equate these activities with the ability to work, but as evidence that Plaintiff's overall allegation of total disability was not fully credible.[15] *Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022). Significantly, the ALJ discussed the "many signs of disfunction" found by the consultative examiner such as decreased ROM and reduced grip strength as well as difficulties ambulating and arising from squatting, but the ALJ pointed out that the examiner

---

[14] Prochaska was decided under SSR 96-7p, the predecessor to SSR 16-3p, which contained a similar list of factors for an ALJ to consider when evaluating credibility.

[15] On her function report and at the hearing, Plaintiff stated that she took care of children and pets, was able to bathe, shave, care for her hair and dress (although buttoning was sometimes hard and she could not feed herself with her left hand), prepared simple meals, vacuumed, dusted, washed dishes, picked vegetables from her garden, drove a car short distances, shopped in stores, went out alone when necessary, handled money, had hobbies such as reading, watching television, scrapbooking and being outside, and socialized with family and friends by talking on the phone or computer with them. (R. 218-30.)

assessed Plaintiff's effort as only "fair-to-poor", which undermined the accuracy of Plaintiff's demonstrated limitations. (R. 29.)[16] *See Simila v. Astrue*, 573 F.3d 503, 518 (7th Cir 2009) (Plaintiff's tendency to overstate his symptoms to his doctors undermined his credibility). Furthermore, the ALJ noted that even with only poor effort, the Plaintiff demonstrated sufficient ability to perform the limited range of light work in the RFC, including having full ROM in her lower extremities, a negative leg raising test, normal, albeit slow, gait, and 4/5 extremity strength except for 3/5 in her left ankle. (*Id.*)

The ALJ then considered Plaintiff's subjective complaints of pain and other symptoms in relation to the medical record as a whole, ultimately determining that Plaintiff's subjective complaints were not entirely credible. *See Schmidt v. Astrue,* 496 F.3d 833, 843-44 (7th Cir. 2007) (upholding credibility determination concerning Plaintiff's subjective complaints of pain when ALJ considered testimony, normal exam findings, and daily activities in addition to objective medical tests), *cited in Slayton v. Colvin,* 629 FedAppx. 764, 771 (7th Cir. 2015). Specifically, the ALJ described examinations from October 2016 through March 2018 that continued to show full ROM in Plaintiff's extremities despite the passage of time and unremarkable musculoskeletal function except for the presence of multiple tender points. (*Id.*) In coming to the conclusion that Plaintiff could perform a limited range of light work, the ALJ also acknowledged her complaints of lower back pain radiating into her legs but noted that she experienced no tingling or sensory loss and had normal examinations, save for some give-way weakness, which reflects the ability to initially resist against an examiner's touch before "giving way" and being able to provide no

---

[16]Although not specifically mentioned by the ALJ, we note that the record contains several other instances during which medical professionals noted Plaintiff's poor effort or insistence that an impairment was more severe than testing or observation suggested. While we cannot assess this evidence because the ALJ did not, we note that its existence belies Plaintiff's own arguments that the ALJ mis-weighed the evidence in finding her less impaired than she alleged.

further resistance. By May 2018, the ALJ explains, neurological follow-up testing revealed normal gait, 5/5 extremity strength, and only modest symptoms of tenderness in her neck and some limited ROM limitations in her upper extremities secondary to pain. (*Id.*)

With respect to Plaintiff's fibromyalgia and autoimmune issues, the ALJ acknowledged Plaintiff's complaints over time of fatigue, stiffness in her hands and overall, and at least at one examination, some decrease in grip strength of the left upper extremity. (*Id.*) Although some of these issues were resolved after Plaintiff's cervical fusion, the ALJ recognized that despite long-term drug therapy Plaintiff continued to complain of fatigue and stiffness and to have some tender points across her body. The ALJ noted that it was "unclear which if any of the claimant's symptoms are truly related to autoimmune disease" but considered claimant's fibromyalgia to contribute to Plaintiff's need for exertional, postural, and manipulative restrictions, as well as to cognitive disfunction. (R. 32.)

The ALJ also reviewed all of Plaintiff's imaging, concluding that "most imaging revealed mild-to-moderate underlying structural abnormalities not suggestive of particular inclination toward worsening over time." (R. 30.) In so finding, she acknowledged imaging that showed DDD in Plaintiff's cervical and later lumbar spine and that x-rays of Plaintiff's "occasionally symptomatic hands" showed only mild soft tissue swelling. (*Id.*) The ALJ discussed all of Plaintiff's treatment, including pain relievers, muscle relaxers, physical therapy, epidural steroid injections, and surgery, noting they had varying degrees of success, and concluded that as a whole, the evidence showed that while Plaintiff did have some work-related restrictions due to her impairments, they did not rise to the level of severity alleged by Plaintiff so to support a finding that she was disabled. *See Shideler v. Astrue,* 688 F.3d 306, 311-12 (7th Cir. 2012) (upholding ALJ's credibility determination where he considered a "broad range of factors" including medical

history, Plaintiff's testimony about pain and other symptoms, medications, daily activities, and factors that aggravated or alleviated his pain).

The ALJ based her determination that Plaintiff's allegations about her mental health were not entirely credible on a similar consideration of factors as she did for Plaintiff's physical impairments, including Plaintiff's treatment history, medications, subjective complaints, and daily activities. The ALJ acknowledged Plaintiff's complaints of brain fog, fatigue, guilt, limited short-term memory, and depression and specifically discussed Plaintiff's physical and mental consultative examination findings (including her short-term memory impairment), and that she was diagnosed only with major depressive disorder, single episode, and neurocognitive disorder. (*Id.*) The ALJ noted that Plaintiff never had any specialized mental health care and that her mental health treatment consisted largely of the use of psychotropic medications such as Amitriptyline. (R. 32-33.)

Plaintiff contends that the ALJ's discussion of her mental health treatment reveals the "misunderstanding of mental illness that Seventh Circuit judges have warned about." (Pl. Mem. at 14-15). She cites *Voight v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2014) for the proposition that an individual's ability to avoid intensive mental health treatment does not indicate that despite mental illness she is capable of maintaining gainful employment. Plaintiff overstates her case. In *Voight*, the claimant had a long history of mental health treatment, and while it may not have risen to the severity of needing to be institutionalized, the Seventh Circuit merely explained that the ability to live outside "in freedom" does not mean one is capable of gainful employment. *Voight*, 781 F.3d at 876. Thus again, we are left only with Plaintiff's insistence that her mental impairments must render her incapable of work by the very fact of their existence, despite substantial evidence to the contrary.

In sum, given this in-depth analysis by the ALJ, we find that substantial evidence supports her determination that Plaintiff's allegations about the severity of her symptoms was not entirely credible and did not demonstrate that she was completely unable to work. Instead, Plaintiff's arguments amount to no more than a disagreement with the way the ALJ weighed the evidence, which is not an appropriate basis for remand. *Poole v. Kijakazi*, 28 F.4th 792, 796 (7th Cir. 2022). The ALJ properly accounted for both the evidence that supported a finding of disability and that which supported a finding that she could work despite her impairments, and thus did not impermissibly "cherry-pick[]" the evidence to arrive at her conclusion.[17] *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010).

## E.    Medical Opinions

The ALJ gave great weight to the opinions of the four Agency doctors (two initial and two on reconsideration), partial weight to the opinion of consultative examiner Dr. Heinrichs, some weight to the opinion of Plaintiff's husband, and little weight to the opinions of Drs. Chavez and Katznelson. We find that substantial evidence supports these determinations.

In general, a "treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is 'well-supported' by medical findings and 'not inconsistent with the other substantial evidence' in the record." *Sonji L. v. Kijakazi*, No. 19 C 4109, 2022 WL 672741, at *5 (N.D. Ill. Mar. 7, 2022) (quoting 20 C.F.R. § 404.1527(c)). "If a treating physician's opinion is not given controlling weight, the ALJ must determine what weight it merits by considering the following factors: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; and (4) the consistency and

---

[17] Without citing to any case law, Plaintiff accuses the ALJ of "cherry picking" because she cited some of Plaintiff's normal examinations and test results in support of her RFC determination, even though the ALJ also acknowledged and explained why she discounted (or took into account in the RFC) evidence of Plaintiff's impairments.

supportability of the opinion." *Id.* (*citing Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018); 20 C.F.R. § 404.1527(c)). Further, the ALJ must "offer good reasons" for giving a treating doctor's opinion less than controlling weight. *See Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). However, while the ALJ must "consider the factors found in found in 20 C.F.R. §. 404.1527(c)," she need only "minimally articulate" her reasoning, and the ALJ "need not explicitly discuss and weigh each factor." *Collins v. Berryhill*, 743 Fed.App'x 21, 25 (7th Cir. 2018), citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (noting that this is a "very deferential standard" which the Seventh Circuit has described as "lax."). Moreover, an ALJ may discount a treating physician's medical opinion that is internally inconsistent or inconsistent with that of a consulting physician, so long as she minimally articulates her rationale. *Skarbek v. Barnhart*, 390 F.3d 500, 503–04 (7th Cir. 2004), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The ALJ gave great weight to the consultative doctors' opinions because all four doctors reviewed all the medical evidence available to them and they are all medical consultants with great familiarity with the SSA program. (R. 33.) Further, the ALJ found the two physical RFC opinions were consistent with the remainder of the medical record, which "contains objective imaging demonstrating generally mild underlying structural abnormalities of the cervical and lumbar spine, coupled with intermittent findings of grip weakness, give-way weakness, tenderness to palpitation, and more." (*Id.*) The ALJ found the mental RFC opinions were also consistent with the medical record, which the ALJ noted was "significant for some modest deficiencies of concentration and memory. Further, the record is also significant for the claimant's complaints of social problems, and for acceptable diagnosis of depression, accounting for the additional social limitations in the specified RFC assessment." (*Id.*)

After giving great weight to the consultative doctors' opinions, the ALJ gave little weight to Dr. Chavez's RFC opinion because the doctor stated outright that she was unable to complete the RFC form or give an assessment about the amount and type of work Plaintiff could complete in a typical workday, "calling into question the amount of claimant-specific knowledge being brought to this opinion." (R. 34.) Although Plaintiff contends that this "honesty" makes the doctor's opinion more – and not less – reliable, she gives no legal support for this position, and regardless of the reliability Plaintiff wished for the ALJ to assign to that opinion, the question before this Court is whether the ALJ weighed the evidence in reaching an opinion that was supported by substantial evidence, even if Plaintiff weighed the evidence differently. The ALJ further noted that Dr. Chavez' opinion is inconsistent with the medical record as a whole, explaining that "no evidence of record suggests that the claimant would have marked limitation of ability to complete a normal workday or workweek, as trends in physical and psychological examinations do not reveal the severe sort of symptomology that could so thoroughly incapacitate someone." (*Id.*) *See Stevenson v. Colvin,* 654 Fed.Appx. 848, 852-53 (7th Cir. 2016) (treating doctor's failure to describe specific physical limitations in RFC and lack of support in the medical record justified ALJ's decision to give it little weight.) We have little trouble concluding that the ALJ's opinion was supported by substantial evidence and that Plaintiff is asking us to re-weigh the evidence. We cannot do so.

The ALJ did not explicitly state that she considered the factors in 20 C.F.R. § 404.1527(c), but even if this omission could be construed as error, any such error was harmless because she addressed most of the factors in her discussion of Dr. Chavez's admission that she did not have enough of a treating relationship with Plaintiff to adequately complete the RFC form, and that she had only seen Plaintiff on four occasions. Given this justification by the ALJ, we find that she

23

more than adequately articulated her reasons for giving Dr. Chavez's opinion little weight. *Ray v. Saul*, 861 Fed.App'x 102, 105–06 (7th Cir. 2021) (stating that even where ALJ does not explicitly articulate consideration of regulations' factors, court may affirm if it is "confident that the ALJ's reasoning sufficiently accounted for the substance of [them].")

The ALJ also supported with substantial evidence her determination that Dr. Katznelson's opinion was entitled to little weight because it was inconsistent with the doctor's own treatment records. (R. 34.) Specifically, she explained that while Dr. Katznelson opined that Plaintiff would have difficulty sustaining any type of full-time work, this determination was inconsistent with his own treatment records, which indicated that Plaintiff had only modest signs of neurological disfunction such as give-way weakness to 4+/5 in all extremities and perhaps some lower back pain radiating to the legs. (*Id.*) The ALJ found nothing in Dr. Katznelson's records to support an inability to perform full-time work. And although again the ALJ did not specifically articulate the § 404.1527(c) factors, we find that this was harmless error. With respect to his area of expertise, Dr. Katznelson specifically noted in the RFC opinion that he treated only Plaintiff's cervical stenosis and related symptoms, and that issues arising from her positive ANA (i.e., her auto-immune disorders) were handled by a rheumatologist. (R. 1107.) *See Schmidt,* 496 F.3d at 842 (7th Cir. 2007) (holding that ALJ properly discounted opinions of two treating doctors by adequately articulating that the opinions were inconsistent with those of the consulting physicians and also were internally inconsistent.)[18]

---

[18] We also find no error in the ALJ's decision to give partial weight to the opinion of the consultative psychological examiner or some weight to Plaintiff's husband. The ALJ found that the consultative examiner examined Plaintiff himself and his opinion that Plaintiff had limited levels of sustained concentration and might have some difficulty adjusting to changing expectations in some work environments was consistent with his examination but that his opined limitations about Plaintiff's concentration, persistence, and pace were expressed in vague and ambiguous language, and the fact that he examined the Plaintiff only once made his opinion less than fully representational of her abilities over time. (R. 34.) The ALJ gave Plaintiff's husband's opinion some weight because he had the opportunity to observe

In sum, substantial evidence supports the ALJ's RFC determination and conclusion that Plaintiff is not disabled. In so finding, we specifically note that the arguable presence, in the record, of some evidence contrary to the ALJ's ultimate conclusion is not a cause for remand. *See Roy R. v. Kijakazi*, No. 19 CV 1687, 2022 WL 1185601, at *8 (N.D. Ill. Apr. 21, 2022), citing *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997) (noting that "where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict).

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment (D.E. 24) is granted and Plaintiff's motion for remand (D.E. 12 is denied).

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: May 10, 2022**

---

Plaintiff day-to-day and because he was fairly specific in describing Plaintiff's ability to lift, which the ALJ found useful when determining that portion of the RFC. (*Id.*)